IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SOMAXON PHARMACUTICALS, INC.,
and PROCOM ONE, INC.,

       Plaintiffs,

  v.

ACTAVIS ELIZABETH LLC, *et al.*,

       Defendants.

Civil Action No. 10-1100-RGA

MEMORANDUM OPINION

Jack B. Blumenfeld, Jeffrey J. Lyons, Jennifer A. Ward, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Jack E. Pace III, Amanda M. Murphy, Holly Tao, WHITE & CASE LLP, New York, NY; Attorneys for Plaintiffs.

John C. Phillips, Jr., Megan C. Hanley, PHILLIPS, GOLDMAN, MCLAUGHLIN & HALL, P.A, Wilmington, DE; David Steuer, Nicole Stafford, Stuart A. Williams, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, CA, Austin, TX, New York, NY; Attorneys for Defendants.

June 24, 2020

/s/ Richard G. Andrews
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is a Report & Recommendation (the "Report") of a United States Magistrate Judge. (D.I. 316). The Report pertains to a motion to enforce a Settlement and License Agreement by the Defendants (Mylan). (D.I. 290). The Report recommends Defendants' motion be granted. (D.I. 316 at 1). Plaintiffs, Somaxon and ProCom, filed objections to the report.[1] (D.I. 318). Defendants responded to Plaintiffs' objections. (D.I. 320). The Magistrate Judge's Report is comprehensive, and I will largely adopt the factual findings and legal conclusions in the Report with the exception of the Magistrate Judge's order for specific performance by the Plaintiff. I do not separately recite any of the Magistrate Judge's factual findings or legal conclusions except as I think necessary to explain my decision.

I.  BACKGROUND

I will not restate the full background of this case as it has been thoroughly described by the Magistrate Judge in the Report. (D.I. 316 at 1-5). Briefly, this action began with a patent infringement suit initiated by Plaintiffs Somaxon and ProCom against Mylan as well as three other generic pharmaceutical companies.[2] (D.I. 1). Plaintiffs and Mylan entered into the

---

[1] Currax became Somaxon's successors-in-interest to the Agreement in April 2019. (D.I. 316 at 4). The brief in opposition to Defendants' motion to enforce the Settlement and License Agreement and the objections to the Report were filed by counsel for Currax. (D.I. 302; D.I. 318). When the Court refers to Plaintiffs it is referring to Currax.

[2] The other three companies were: Par Pharmaceutical, Zydus Pharmaceuticals, and Actavis. (D.I. 302 at 4). Each of these companies filed an Abbreviated New Drug Application (ANDA) that triggered the litigation. (*Id*.). An ANDA is filed for a drug that is bioequivalent to a drug that has been previously approved and filed pursuant to §355(b)(1) of the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 355(b)(1) (2020); 21 U.S.C. § 355(j) (2020). "Bioequivalence is the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study." U.S. Food & Drug Admin., Orange Book Preface: Approved Drug Products with Therapeutic Equivalence Evaluations §1.2 (Feb. 2, 2020),

Agreement on July 17, 2012, and the Court then dismissed Plaintiffs' case against Mylan. (D.I. 234). In April 2019, Currax became Somaxon's successor-in-interest to the Agreement. (D.I. 316 at 4).

The parties' dispute revolves around §5.1(a) of the Agreement. (D.I. 292-1 ex. A § 5.1(a)). Section 5.1(a) provides Mylan with the semi-exclusive right to sell an authorized generic (AG)[3] version of Currax's drug, Silenor® 3 mg and 6 mg doxepin hydrochloride, for 180 days beginning on January 1, 2020 (the "AG License Initial Period").[4] (D.I. 292-1 ex. A §1.12, § 1.14(a), § 1.18, § 1.2, § 5.1(a)). In October 2019, Currax informed Mylan that Currax planned to launch its own AG product "on or around January 1, 2020." (D.I. 303 ¶ 14). Mylan filed the pending motion to enforce the Agreement on December 23, 2019. (D.I. 290). The Court must determine whether Currax's plan to market and sell its own AG constitutes a breach of the

---

https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface; 21 U.S.C. § 355(j)(8)(B) (2020). Each company settled with Somaxon and ProCom. (D.I. 302 at 4; D.I. 233; D.I. 235; D.I. 237; D.I. 283).

[3] "'Authorized Generic Product' means a Generic Product that is manufactured, used, sold, offered for sale or distributed pursuant to the Somaxon [New Drug Application], but that is not marketed under the Trademark." (D.I. 292-1 ex. A § 1.3). A New Drug Application (NDA) refers to stand-alone applications submitted under § 355(b)(1) of the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 355(b)(1).

[4] Somaxon and ProCom "[may also] grant one (1) additional License for the AG License Initial Period to a product that is AB rated to Silenor 3 mg and 6 mg doxepin hydrochloride tablets, but such product shall not be an Authorized Generic Product." (D.I. 292-1 ex. A § 5.1(a)). An AB rated generic is a "[d]rug product[] that FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products . . . ." U.S. Food & Drug Admin., Orange Book Preface: Approved Drug Products with Therapeutic Equivalence Evaluations §1.7 (Feb. 2, 2020), https://www.fda.gov/drugs/development-approval-process-drugs/orange-book-preface. The company selling the generic must submit "in vivo and/or in vitro evidence supporting bioequivalence" to receive the AB designation. (*Id.*). Pursuant to § 5.1(a) of the Agreement Currax granted another generic company, Actavis, the right to launch the AB-rated generic version of Silenor® beginning on January 1, 2020, and Actavis' generic product is currently on the market. (D.I. 303 at ¶ 18; 3/3/2020 Tr. at 6:4-14).

parties' Agreement, if § 5.1(a) of the Agreement is enforceable, and if Defendants are entitled to specific performance.[5]

II.     LEGAL STANDARD

Magistrate Judges have the authority to make recommendations as to the appropriate resolution of a motion for summary judgment. 28 U.S.C. § 636(b)(1)(B). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A motion to enforce a settlement agreement resembles a motion for summary judgment. *Orthophoenix, LLC v. Stryker Corp.*, 2017 WL 1197675, at *4 (D. Del. Mar. 28, 2017); *Tiernan v. Devoe*, 923 F.2d 1024, 1031-32 (3d Cir. 1991). Both a motion to enforce a settlement agreement and a motion for summary judgment deprive the non-moving party of their right to be heard at trial. *Tiernan*, 923 F.2d at 1031. A motion to enforce a settlement agreement is case-dispositive, meaning this Court reviews the objected-to recommendations *de novo*. Fed. R. Civ. P. 72(b)(3); D. Del. LR 72.1(a)(3).

A motion to enforce a settlement agreement may be granted if the record shows that "the moving party is entitled to judgment as a matter of law." *Frederick v. Avantix Labs., Inc.*, 2017 WL 995430, at *2 (D. Del. Mar. 14, 2017); Fed. R. Civ. P. 56(a). The Court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The party adverse to the motion bears the burden of establishing facts sufficient for the Court to conclude there is a genuine dispute of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250

---

[5] This Court has ancillary jurisdiction to enforce this Agreement because the terms of the Agreement were made "part of the order of dismissal." (D.I. 233 at 2 § d; D.I. 234); *Raab v. City of Ocean City*, 833 F.3d 286, 294 (3d Cir. 2016). The parties do not dispute the jurisdiction of this Court in deciding this matter. (D.I. 291; D.I. 302).

(1986). When material facts are in dispute, the court should hold an evidentiary hearing on the motion. *See Tiernan*, 923 F.2d at 1031.

### III. DISCUSSION

Defendants assert that Plaintiffs have breached a binding and enforceable provision of the Agreement, and that Defendants have incurred and continue to incur harm as a result of Plaintiffs' breach. (D.I. 291 at 8, 10-11). Plaintiffs argue that § 5.1(a) of the Agreement is not enforceable, that they have not materially breached the Agreement, and that Defendants are not entitled to the relief that they are seeking. (D.I. 302 at 9, 15, 16). The Magistrate Judge found Plaintiffs were in breach of an enforceable term in the Agreement and recommends the Court grant Defendants' request for specific performance. (D.I. 316 at 16-17). Plaintiffs object to the Magistrate Judge's findings that (1) § 5.1(a) of the Agreement was enforceable and (2) Plaintiffs have materially breached the Agreement. (D.I. 318).

As stated by the Magistrate Judge: "Principles of contract law govern the enforcement of settlement agreements." (D.I. 316 at 5). The Agreement contains a Delaware choice of law provision that states, "This Agreement shall be governed, interpreted and construed in accordance with the laws of the State of Delaware . . . ." (D.I. 292-1 ex. A § 12.2). Delaware law governs the Court's breach of contract analysis in this case. To prevail on their motion to enforce the Agreement, Defendants must prove by a preponderance of the evidence: (1) the existence of a contract; (2) that the Plaintiff breached an obligation imposed by the contract; and (3) resultant damages to the Defendants. *Jacob's Limousine Transp., Inc. v. City of Newark*, 688 F. App'x 150, 152 (3d Cir. 2017); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

### A. Currax breached § 5.1(a) of the Agreement.

There is no dispute that there was an Agreement. (D.I. 291 at 2, D.I. 302 at 1). There is no dispute that Plaintiffs breached an obligation in the Agreement. (D.I. 291 at 10; D.I. 302 at 8, 15). The parties do dispute whether the breach was material. (D.I. 291 at 10-11; D.I. 302 at 15-17). The law gives rise to a remedy for both non-material breach and material breach of contract; it is not necessary for the Court to determine if Plaintiffs' breach was material to enforce the Agreement.[6] *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003); *see also* 10 Arthur L. Corbin, Joseph M. Perillo & John E. Murray Jr., Corbin on Contracts § 53.4 (2019). The Court finds Plaintiffs breached the agreement.

### B. Defendants have proven damages.

Defendants must prove damages by a "preponderance of the evidence; absolute precision is not required but the proof may not be speculative either." *Frontier Oil v. Holly Corp.*, 2005 WL 1039027, at *39 (Del Ch. Apr. 29, 2005). The Magistrate Judge found that Defendants have sufficiently proven damages. (D.I. 316 at 16). Plaintiffs do not object to the Magistrate Judge's conclusion. (D.I. 318). The Court agrees with the Magistrate Judge. Briefly, Plaintiffs do not dispute they breached § 5.1(a) of the Agreement by marketing their own AG during the designated exclusivity period. (D.I. 302 at 16). By virtue of this admission Plaintiffs have conceded Defendants incurred damages in the form of a decreased market share.[7] (D.I. 291 at 7). Defendants

---

[6] The Court is puzzled as to why Defendants raise this issue. Perhaps it is because of § 11.1 of the Agreement stipulates Plaintiffs are entitled to seek injunctive relief or specific performance when there is a material breach by the Defendants. (D.I. 292-1 ex. A §11.1). As far as the Court can determine, the parties have not contracted around the right to seek relief for a non-material breach: "Nothing in this Agreement is intended, or shall be construed, to limit the Parties' rights to equitable relief or any other remedy for a breach of any provision of this Agreement." (D.I. 292-1 ex. A § 11.2). Defendants are also not attempting to use the breach by Plaintiffs to justify their own non-performance or to argue that the entire contract should be cancelled. (D.I. 291 at 9; D.I. 306 at 7). The issue of materiality is irrelevant to the Court's determination.

[7] Plaintiffs admit they are manufacturing, marketing, and selling their own AG of Silenor®. (D.I. 302 at 16-17).

6

now have to compete with Plaintiffs' AG and Actavis' AB-rated generic rather than with just the Actavis generic. (D.I. 316 at 2). The Court finds that Defendants have proven damages.

### C. § 5.1(a) of the Agreement is enforceable.

The primary dispute addressed in the Magistrate Judge's recommendation and the subsequent briefing is whether § 5.1(a) of the Agreement is enforceable. (D.I. 302 at 9-14; D.I. 306 at 4-6; D.I. 316 at 6-14). Plaintiffs argue that § 5.1(a) is illegal under current antitrust law, which would make it unenforceable. (D.I. 302 at 11). The Magistrate Judge found that § 5.1(a) did not run afoul of current jurisprudence on reverse settlement agreements[8] between brand name drug companies and generic drug companies. (D.I. 316 at 13). Plaintiffs object to this finding and maintain that § 5.1(a) of the Agreement is unenforceable under current antitrust law. (D.I. 318 at 5-7).

The parties settled before the Supreme Court's seminal ruling in *F.T.C. v. Actavis, Inc.*. 570 U.S. 136 (2013). In *Actavis* the Supreme Court held that reverse settlement agreements should be evaluated for antitrust violations with rule-of-reason analysis. *Id*. at 159-60. When performing a rule-of-reason analysis the Third Circuit[9] uses a burden shifting analysis where the plaintiff must show that the "agreement produced adverse, anti-competitive effects within the relevant product and geographic markets . . . ." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). The plaintiff "satisf[ies] this burden by proving the existence of actual anticompetitive effects . . . ."

---

[8] A reverse settlement agreement within the context of pharmaceutical patent infringement is one in which the patentee must pay the alleged infringer. *F.T.C. v. Actavis, Inc.,* 570 U.S. 136, 140 (2013). These agreements are not presumptively unlawful. *Id*. at 158-59.

[9] The basis of Plaintiffs' non-enforceability defense is that the Agreement violates the Sherman Act, 15 U.S.C. § 1 (2020). (D.I. 302 at 11). The Third Circuit's rule-of-reason analysis is controlling authority as federal law governs this analysis. Plaintiffs also argue unenforceability under California antitrust law, and that argument is addressed later in this opinion. *Infra* at 12 & n.19.

(*Id.*). Once the plaintiff has met its burden, the defendant must "show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. If the defendant meets its burden, the plaintiff can rebut the defendant's assertion by showing that "the restraint is not reasonably necessary to achieve the [defendant's] stated objective." (*Id.*).

The plaintiff must prove "payment for delay"[10] to prove anticompetitive effects in the context of reverse settlement agreements. *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 412 (3d Cir. 2015). The Magistrate Judge concluded that Plaintiffs have failed to prove enforcing § 5.1(a) of the Agreement would result in anticompetitive harm. (D.I. 316 at 13). The Court agrees completely with this conclusion. Plaintiffs seem to have conflated the standards for pleading an antitrust claim with *proving* an antitrust claim. (*Id.* at 8 n.3). At this stage of the proceedings, it is not sufficient to allege a harm; Plaintiffs must offer evidence that there is one.[11] *Brown Univ.*, 5 F.3d at 668. Plaintiffs submitted two declarations in connection with their opposition to the motion. (D.I. 303; D.I. 304). Neither one offers any evidence of any anticompetitive harm. Plaintiffs submitted another declaration with its objection (D.I. 319), but that declaration presents evidence that was not before the Magistrate Judge, and I therefore

---

[10] "Pay for delay" is a payment from the brand name drug company to the generic drug company to prevent the commercialization of the generic product and to lock other generics out of the market. Herbert Hovenkamp et al., IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law §16.01 (3d ed. 2019).

[11] Plaintiffs appear to interpret no-AG agreements or anything resembling them to be *per se* illegal. (D.I. 302; D.I. 318). This presumptive illegality is exactly what the Supreme Court rejected in *Actavis*. *See Actavis, Inc.*, 570 U.S. at 159. The Third Circuit has held that a no-AG provision may be analyzed under the rule-of-reason framework, but that is the beginning of the story. *King Drug Co.*, 791 F.3d at 403. Plaintiffs must still meet their burden to prove anticompetitive effects. *Brown Univ.*, 5 F.3d at 668. In their objection, Plaintiffs assert that the Magistrate Judge did not treat all of their assertions as true, quoting *Tiernan*, 923 F.2d at 1032. (D.I. 318 at 2). But *Tiernan* did not purport to alter established law; there is a difference between an asserted fact, which requires some evidentiary support, and the assertions of an attorney, which are entitled to no weight. Plaintiffs offered no evidentiary support, and therefore did not create any disputed material facts.

disregard it. Fed. R. Civ. P. 72(b)(3); D. Del. LR 72.1(b); *Subh v. Wal-Mart Stores E., LP*, 2009 WL 3153511, at *1 (D. Del. Sept. 30, 2009) (describing the court's discretion in receiving and reviewing further evidence in resolving objections to a Magistrate Judge's Report and Recommendation), *aff'd*, 386 F. App'x 29 (3d Cir. 2010).

Plaintiffs' theory of competitive harm appears to be that a two-generic market results in higher drug prices than a three-generic market.[12] (D.I. 318 at 6). Plaintiffs put forward no evidence as to how one less generic may actually impact drug prices *in this case*.[13]

I cannot read the relevant Third Circuit case — *King Drug* — without seeing the emphasis on two things. One, a "no-AG" provision may be subject to the rule-of-reason analysis "when it represents an unexplained large transfer of value from the patent holder to the alleged infringer." *King Drug Co.*, 791 F.3d at 403. In *King* the court held that the specific no-AG agreement *in that case* was subject to the rule-of-reason analysis because it "[could] represent an unusual, unexplained transfer of value from the patent holder to the alleged infringer that [could not] be adequately justified." *Id*. at 409. Here, Plaintiffs have not shown that § 5.1(a) of the Agreement fulfills this criterion. Second, even if the Court determines a given "no-AG" provision is subject to rule-of-reason analysis, the ultimate outcome of that analysis turns on myriad facts. *Id*. at 412 (describing the fact-intensive inquiry required for rule-of-reason analysis). The Plaintiffs have not presented any facts that indicate there were anticompetitive effects *in this case*.

---

[12] As the Magistrate Judge noted, there are other theories of anticompetitive harm that may be applicable in this case, but these were not advanced by Plaintiffs. (D.I. 316 at 9 n.5).
[13] Plaintiffs incorrectly assert that because FTC has publicly mentioned that no-AG agreements may cause consumer harm that general statement is sufficient to prove harm in this case. (D.I. 318 at 6).

9

The Court finds that the Plaintiffs have failed to meet their burden to show anticompetitive effects.[14]

### D. Monetary damages are the proper remedy for the breach of contract.

Because Defendants have met their burden to prove their breach of contract claim, the Court must determine if the Defendants are entitled to the relief they seek. Defendants ask the Court to order specific performance of § 5.1(a) of the Agreement. (D.I. 316 at 16; 3/3/2020 Tr. at 13:5-15; 18:1-11). "[S]pecific performance is not a matter of absolute right but rests within the sound discretion of the court . . . ." *Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., Inc.*, 201 F.3d 231, 249 (3d Cir. 1999). "Specific performance is an extraordinary remedy" that is appropriate when "assessing money damages would be impracticable or would fail to do complete justice." *W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC*, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007). Under Delaware law the party seeking specific performance must prove by clear and convincing evidence that they are entitled to such a remedy and that they have no "adequate legal remedy." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). This

---

[14] Plaintiffs raise another objection that further supports the Court's view that Plaintiffs misunderstand their initial burden under the rule-of-reason analytical framework. (D.I. 318 at 7). Plaintiffs title one of their objections, "The Report's Holding That Only a Contract That Is Illegal 'On Its Face' Can Be Unenforceable Is Contrary to Law." (D.I. 318 at 7). Plaintiffs then direct the Court to the relevant portion of the Report which essentially states there is no case that supports the view that a no-AG provision is *per se* illegal. (D.I. 316 at 7; D.I. 318 at 8). The Magistrate Judge was correct. The Court can find no authority that has found no-AG provisions to be *per se* illegal. In fact, if such a case did exist, it would be in conflict with the Supreme Court's explicit rejection of presumptive illegality in *Actavis*. Supra n. 11. When the Magistrate Judge discussed the fact-intensive inquiry that the Court must undertake when determining if a no-AG agreement is illegal, the Magistrate Judge was explaining why Plaintiffs have not met their burden to show anticompetitive harm. (D.I. 316 at 8-9). Proving anticompetitive harm is the first step of the rule-of-reason analysis, and it is a burden that the *plaintiff* bears. Supra n. 11. Plaintiffs seem to be of the view that merely showing these types of agreements have been held to be illegal means all no-AG agreements are illegal. This is a misunderstanding of the law. Plaintiffs' objection is dismissed.

requires establishing "(1) a valid contract exists, (2) [the party] is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." *Id*. at 1158. Defendants have established element one and two.[15] When evaluating the balance of the equities, the Court must be convinced that ordering specific performance will not cause greater harm than it would prevent. *Id*. at 1161.

Defendants assert that the harms that flows from the breach are: "lost revenues, loss of market share, price erosion, and loss of customer goodwill" as well as the loss of the first mover advantage. (D.I. 291 at 11). The Magistrate Judge recommends that an order of specific performance is an appropriate remedy in this matter.[16] While that recommendation made sense at the time the Magistrate Judge made it, the passage of time leads me to conclude that the balance of the equities does not now weigh in favor of granting specific performance. Defendants have already lost the majority of their semi-exclusive window for selling the AG of Silenor®.[17] By the time Plaintiffs are able to pull their AG from the market the Defendants' exclusivity period will likely have lapsed.[18] An order of specific performance is not appropriate when monetary damages

---

[15] There is no dispute that there is an Agreement, and Defendants have already performed by waiting to launch an AG until the agreed-upon date. (D.I. 291 at 2-3, 6; D.I. 302 at 1).

[16] Perhaps because of the page limits, Plaintiffs do not renew their objection to the Magistrate Judge's recommendation that I order specific performance despite their earlier assertion that "[they] will suffer significant harm if [they] must pull [their] authorized generic Silenor® AG product off the market, as [they] would be forced to absorb the costs and resource expenditures associated with a generic product launch." (D.I. 302 at 16; D.I. 318).

[17] Defendants were granted 180 days of semi-exclusivity for their AG starting on January 1, 2020. (D.I. 292-1 ex. A § 1.14(a), 1.2, 5.1(a)). It is now late-June of 2020. Defendants made no request for expedition. It has only recently come to my attention that the motion to enforce was time sensitive.

[18] The Court must be convinced granting specific performance "would [not] cause even greater harm than it would prevent." *Osborn*, 991 A.2d at 1161. The cost of pulling a generic off of the market, to grant the Defendants at most a week of exclusivity, strikes the court as harmful for consumers and distributors. It is unnecessarily harmful given the fact that Defendants' alleged injuries should be readily quantifiable for the purposes of monetary damages.

would be sufficient to compensate the injured party, and when it is possible to arrive at a legal measure with a reasonable degree of certainty. *See Sheet Metal Workers' Ass'n*, 201 F.3d at 249-50. The Court finds the more appropriate remedy is monetary damages. Defendants are free to pursue damages for their breach of contract claim. *See Morabito v. Harris*, 2002 WL 550117, at *3 (Del. Ch. Mar. 26, 2002).

### E. California law does not govern in the matter currently before the Court.

The Agreement contains a Delaware choice of law provision that states, "This Agreement shall be governed, interpreted and construed in accordance with the laws of the State of Delaware . . . ." (D.I. 292-1 ex. A § 12.2). Plaintiffs argue that § 5.1(a) of the Agreement is not enforceable under California law. (D.I. 302 at 14). The Magistrate Judge concluded that Plaintiffs may not invoke California law for a variety of reasons.[19] Plaintiff does not object to this determination. The Court holds that the Magistrate Judge was correct to conclude that the California law does not govern the interpretation of the enforceability of § 5.1(a).

### IV. CONCLUSION

For the reasons discussed above, I largely adopt the recommendations set forth in the Magistrate Judge's Report with the exception of the order for specific performance. Since specific performance was the only relief sought, I therefore must deny Defendants' motion. Defendants are free to pursue damages for their breach of contract claim.

The Court will enter a separate order.

---

[19] The Magistrate Judge held that Plaintiffs cannot apply California law retroactively, the statute of limitations has run, and there is no private right of action. (D.I. 316 at 14-15). Since Plaintiffs do not dispute the validity of the contractual term that stipulates "This Agreement shall be governed, interpreted and construed in accordance with the laws of the State of Delaware," I am not entirely sure why California law would matter in any event. (D.I. 292-1 ex. A § 12.2).

12